## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ketrick Kelley, being duly sworn, hereby state as follows:

I am a Special Agent of the Federal Bureau of Investigation (FBI) currently working in the Mobile Division in Mobile, AL. I have been employed with the FBI for approximately 16 years and have investigated drug trafficking organizations, drug conspiracies, pill mills, and various other drug-related crimes. I am well versed in the methodology utilized in narcotics trafficking, the specific type of language used by narcotics traffickers, and the unique patterns employed by narcotics organizations. I have conducted physical surveillance, electronic surveillance, and consensual recordings in drug investigations. I am familiar with methods of searching locations where narcotics and/or narcotic proceeds may be found. I have arrested numerous individuals for various drug violations and have spoken with numerous drug dealers, drug users, and informants concerning the methods and practices of drug traffickers.

There is probable cause to believe that from around February 14, 2012 to around September 3, 2014, Thomas Daniel Williams ("Williams") violated the following federal statutes: 18 U.S.C. § 1956(a)(2)(A) (international money laundering), 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), and 21 U.S.C. § 952(b) (importation of controlled substances).

Anabolic steroids may not be possessed lawfully in the United States without a valid prescription. 21 U.S.C. § 812, Schedule III (e), designates anabolic steroids as a Schedule III controlled substance. 21 U.S.C. § 802(41)(A) defines the term "anabolic steroid" as "any drug or hormonal substance, chemically and pharmacologically related to testosterone" with exceptions for estrogens, progestins, corticosteroids, and dehydroepiandrosterone. This subsection also designates 59 specific compounds statutorily determined to be anabolic steroids.

1

## Investigation

I have used two confidential human sources (CHSs) in my investigation of Williams. On January 21, 2014, CHS-1 informed me that Williams was unlawfully distributing anabolic steroids, cocaine (a Schedule II controlled substance), hydrocodone (a Schedule II controlled substance, and other drugs in Orange Beach and Gulf Shores in the Southern District of Alabama. CHS-1 told me Williams was a personal fitness trainer.

In February 2014, I visited the Orange Beach Recreation Center at 4849 Wilson Boulevard, Orange Beach, AL 36561. I observed business cards at the center for personal fitness trainers, including Williams.

Around April 7, 2014, I determined that Williams's home was in Orange Beach based on surveillance and CHS-2's contacts with Williams. Williams's home address is 26555 Marina Road, Orange Beach, AL 36561.

On April 22, 2014, I saw a garbage can located out on the curb for collection in front of Williams's home. From the trash in the can, I recovered one empty bottle of Taitropin 10iu human growth hormone and five used syringes. Human growth hormone is a Schedule III controlled substance.

On May 1, 2014, CHS-1 advised me that Williams posted video online to his Facebook page from the Mullet Toss event, held around April 26, 2014 at the Flora-Bama Lounge and Oyster Bar in Orange Beach, AL. CHS-1 said that in the video Williams bragged about distributing anabolic steroids. FBI personnel downloaded the online video, which I have reviewed. In one portion of the video, Williams stated: "Look at all these new customers I got." In another excerpt, Williams stated: "I'm making a video for my new store online, steroids.com."

2

In June 2014, I gave CHS-2 Williams's phone number from the contact information on Williams's business card.

Around June 16, 2014, CHS-2 began communicating with Williams via text message. The initial purpose of the communications was to set up a time and place for personal training. Part of CHS-2's story was that he resided in Mississippi and had family members around Orange Beach.

On June 23, 2014, I outfitted CHS-2 with an audio / video recording device. CHS-2 went to the Orange Beach Recreation Center, met with Williams, and exercised. CHS-2 then followed Williams to his home. Later, Williams entered CHS-2's vehicle and they had lunch at a local restaurant. CHS-2 took Williams back to his home.

On June 24, 2014, I outfitted CHS-2 with an audio / video recording device. CHS-2 went to the Orange Beach Recreation Center, met with Williams, and exercised. CHS-2 and Williams left the center. Later, CHS-2 had text message communications with Williams concerning the purchase of anabolic steroids.

On June 25, 2014, I outfitted CHS-2 with an audio / video recording device. I searched CHS-2 and CHS-2's vehicle for contraband and found none. I gave CHS-2 pre-recorded U.S. currency. CHS-2 went to the Orange Beach Recreation Center, met with Williams, and exercised. CHS-2 then followed Williams to his home and went inside. CHS-2 waited in the living room area as Williams went upstairs. Williams returned and handed CHS-2 one bottle labeled Sustanon 300, one bottle labeled Methyl testosterone, and ten unused syringes in exchange for $180. During the transaction, Williams stated: "I usually get, charge 250 for it but I'm just trying to help you out." I believe Williams's statement and the aforementioned Mullet Toss video indicated that he had other customers who sought anabolic steroids. CHS-2 left

3

Williams's home, met with me, and relinquished the aforementioned bottles, syringes, and recording equipment. I again searched CHS-2 and CHS-2's car for contraband and found none. I submitted the bottles to the FBI chemical analysis unit in Quantico, VA. Analysis of samples from the bottles showed the presence of methyl testosterone, testosterone isocaproate, testosterone enanthate, testosterone phenylpropionate, testosterone propionate, testosterone acetate, and testosterone decanoate, all of which are anabolic steroids and are Schedule III controlled substances. I submitted the recording device used by CHS-2 to FBI Mobile.

In July 2014, I instructed CHS-2 to make another controlled purchase of anabolic steroids from Williams. CHS-2's physical appearance had not changed since he made the first controlled purchase of anabolic steroids from Williams. I instructed CHS-2 to tell Williams that since CHS-2 lived in Mississippi, CHS-2's relative would pick up the steroids from Williams.

On July 24 and 25, 2014, CHS-2 made consensual phone recordings with Williams. During these conversations, Williams agreed to distribute additional anabolic steroids to CHS-2. Williams told CHS-2 that on Williams's last order of steroids he received 30 free bottles of methyl testosterone. Based on my training and experience, I believed that Williams received the free bottles because he was ordering and paying for large quantities of steroids. I also believed that this shipment was not just for Williams's personal use.

On July 25, 2014, CHS-2 had text message communications with Williams concerning the purchase of steroids. Williams arranged to mail the steroids to CHS-2 in Mississippi.

On July 27, 2014, I placed $300 in pre-recorded confidential case funds in a stamped envelope addressed to Williams at his home. I sent the money to FBI SA Jerome Lorraine in Pascagoula, MS. On July 28, 2014, SA Lorraine placed the envelope in the US mail.

On July 28, July 29, and August 4, 2014, CHS-2 had text message communications with Williams concerning the purchase of steroids.

Around August 4, 2014, I contacted U.S. Postal Inspector Bobby Gechijian and asked to have the incoming address flagged for a package from Orange Beach, AL.

On August 5, 2014, Inspector Gechijian advised me the postmaster in Biloxi, MS had intercepted a package. I drove to Biloxi and took custody of the package from the postmaster. I observed the package to be addressed to "Davis" from "Williams." I obtained consent from CHS-2 to search the package and mobile phone used to communicate with Williams. The package contained a box with one bottle labeled Sustanon 300 and one bottle labeled Methyl testosterone. I submitted the bottles to the FBI chemical analysis unit in Quantico, VA. Analysis of samples from the bottles showed the presence of Methyl testosterone, testosterone isocaproate, testosterone enanthate, testosterone phenylpropionate, testosterone propionate, testosterone acetate, and testosterone decanoate, all of which are anabolic steroids and are Schedule III controlled substances. I submitted the mobile phone to FBI Mobile. Sustanon 300 is an anabolic steroid manufactured by Matrix Laboratories. Matrix Laboratories does not have a laboratory in Orange Beach, AL. In addition, methyl testosterone is an anabolic steroid that is not manufactured in Orange Beach, AL. Based on the Mandarin Chinese label on the bottle, I believe the methyl testosterone that CHS-2 had purchased from Williams was likely manufactured in China.

On August 27, 2014, I requested a search warrant authorizing the search of Williams's home and the seizure of certain items at his home. That same day, the U.S. District Court for the Southern District of Alabama issued a search warrant based on probable cause to believe that

5

evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) were located at Williams's home.

On September 3, 2014, I led the FBI in the execution of the search warrant at Williams's home. Among other items, I seized steroids, syringes, bottles, and other items related to steroid use. I seized vials of nandrolone decanoate, equipoise, primobolan, tri trenbolone, testosterone enanthate, testosterone cypionate, methyltestosterone, and recombinant human growth hormone. A subsequent laboratory analysis confirmed the composition of steroids seized from Williams's home. I also observed numerous prescription pills in Williams's home.

During the execution of the warrant, I conducted a recorded interviewed of Williams at his home. After I Mirandized him, Williams admitted to possessing anabolic steroids and various paraphernalia at his home. Williams showed me the anabolic steroids at his home and explained to me the purposes of the substances. He admitted to purchasing, using, and selling steroids. Williams told me he obtained anabolic steroids from several sources, including from the Internet via payments made through Western Union. He said the steroids he bought online came primarily from China and that he would arrange for the steroids to be shipped to him in the Southern District of Alabama. Based on my investigation and research, I do not believe Williams imported anabolic steroids for medical, scientific, or other legitimate uses, or had a valid prescription (or other lawful authority) to legally possess the anabolic steroids he imported from overseas.

On September 5, 2014, I conducted another recorded interviewed of Williams. During this conversation, he admitted to purchasing, using, and distributing cocaine on several occasions. Williams's text communications, which I have reviewed, show his involvement in the purchase and acquisition of cocaine for other individuals.

Around October 10, 2014, Western Union provided the FBI a spreadsheet containing financial transactions initiated by Williams. The spreadsheet shows that between February 14, 2012 and July 16, 2014, Williams used Western Union on approximately ten different occasions to electronically transmit a total of approximately $17,355 from a Winn-Dixie store in the Southern District of Alabama to China. Furthermore, on January 15, 2013, Williams used Western Union to electronically transfer $610 to an individual residing in the Ukraine. Ultimately, I believe Williams initiated these financial transactions and sent U.S. currency overseas with the intent to acquire anabolic steroids and promote the specified unlawful activity of anabolic steroid distribution in the United States.

Finally, I believe Williams is a danger to the community because of his drug use, drug sales, criminal history, and propensity for violence, including acts of domestic violence. He was convicted on June 16, 2000 of carrying a concealed firearm, a felony under Florida law. I have reviewed numerous police incident reports involving Williams and acts of violence. He has been arrested for several bar fights in and around Orange Beach. In our conversation on September 3, 2014, he admitted to me to punching and knocking out an individual during one bar fight at The Wharf in Orange Beach in December 2013. In another incident, he allegedly beat up an off-duty police officer working as a doorman at a bar in Orange Beach. According to another police report, around February 17, 2015 Williams allegedly verbally threatened a police officer in uniform in Orange Beach following a Mardi Gras parade. I have spoken with several local law enforcement officers who believe Williams poses a danger to the community.

## Conclusion

Based on the aforementioned information, I respectfully submit that there is probable cause to believe that Williams has violated 18 U.S.C. § 1956(a)(2)(A) (international money laundering), 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), and 21 U.S.C. § 952(b) (importation of controlled substances).

_____
KETRICK KELLEY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

THE ABOVE AGENT HAD ATTESTED
TO THIS AFFIDAVIT PURSUANT TO
FED. R. CRIM. P. 4.1(b)(2)(B) THIS ___
DAY OF JUNE 2015

_____
UNITED STATES MAGISTRATE JUDGE